147 N.J. Super. 446 (1977)
371 A.2d 380
ROBERT DEVLIN, PLAINTIFF,
v.
AUGUST E. GREINER, JR., INDIVIDUALLY AND AUGUST E. GREINER, JR. T/A AUGUST E. GREINER, JR., ASSOCIATES, DEFENDANTS. BARBARA S. HOGAN, PLAINTIFF,
v.
AUGUST E. GREINER, JR., INDIVIDUALLY AND AUGUST E. GREINER, JR. T/A AUGUST E. GREINER, JR., ASSOCIATES, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 28, 1977.
*451 Ms. Karen Ackermann for plaintiff Robert Devlin (Messrs. Gindin & Gindin, attorneys).
Mr. Barry H. Evenchick for plaintiff Barbara Hogan (Messrs. Walder, Steiner, Sondak & Evenchick, attorneys).
Ms. Naomi F. Eber for defendant (Messrs. Meth, Wood & Broeger, attorneys).
DREIER, J.C.C., Temporarily Assigned.
Defendant has moved for summary judgment in the captioned cases. Although the respective actions of plaintiffs Hogan and Devlin have not yet been consolidated, the similarity of facts and issues mandates a single resolution.
In this motion the court must give all favorable inferences to plaintiffs. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954). Thus viewed, the affidavits before the court justify the following statement of facts. R. 4:46-2.
*452 On August 16, 1974 Thomas Hogan, husband of plaintiff Barbara Hogan, hired defendant, a private detective, to investigate her activities involving plaintiff Robert Devlin. The surveillance ran from August 17 to August 29, 1974. The report tendered by defendant chronicled a series of occasions on which defendant observed plaintiffs together in compromising situations, and concludes with the following statement: "Investigation indicates a clear and apparently static pattern of association between subject and male subject."
Subsequently in October 1974 Thomas Hogan instituted suit against his wife, seeking a divorce on the grounds of adultery and naming plaintiff Devlin as correspondent. The essential contents of the report were later repeated by defendant in the form of an affidavit filed with the court in the divorce action. The divorce was ultimately granted on May 10, 1976 on Mrs. Hogan's counterclaim (based upon other grounds) and the original complaint dismissed with prejudice.
For purposes of this motion, plaintiffs have produced responsive affidavits showing that the observations claimed to have been made by defendant on various occasions must have been fabrications.
Although framed in only two counts, a fair reading of plaintiff Devlin's complaint sets forth causes of action sounding in privacy, intentional infliction of mental distress, and negligence. The complaint of plaintiff Hogan alleges causes of action in negligence, privacy, intentional infliction of mental distress, and libel. Both seek compensatory and punitive damages.
Defendant argues that regardless of what causes of action are set forth in the respective complaints, all are barred by his timely claim of absolute privilege.[1] His argument is that *453 the report was made by him as a witness in an incident judicial proceeding, and thus was absolutely privileged.
The doctrine of absolute immunity with respect to statements made in the course of judicial proceedings is one firmly established in our law. La Porta v. Leonard, 88 N.J.L. 663 (E. & A. 1916); Rogers v. Thompson, 89 N.J.L. 639 (E. & A. 1916); Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552 (1955); Fenning v. S.G. Holding Corp., 47 N.J. Super. 110 (App. Div. 1957); Middlesex Concrete, etc. v. Carteret Industrial Ass'n, 68 N.J. Super. 85 (App. Div. 1961). The doctrine is derived from the English rule, which differs slightly from the American rule in that England affords a "true" absolute privilege without regard to the relevancy of the statements to the subject matter of the proceedings. Munster v. Lamb, [1883] 11 Q.B.D. 558. The only dilution of the rule which has occurred in New Jersey (and in most American jurisdictions) is the requirement that the defamatory matter uttered have some relation to the nature of the proceedings. Thus, statements made in the course of judicial proceedings, but not relevant thereto, are excluded from the privilege. However, as stated in Fenning v. S.G. Holding Corp., supra, 47 N.J. Super. at 118; "The pertinency thus required is not a technical legal relevancy * * *. As to the degree of relevance needed to invoke the absolute shield of this immunity, the courts are most liberal * * *." The privilege has also been held to apply to *454 quasi-judicial proceedings before a tribunal recognized by law which, though not a court in the ordinary sense, exercises judicial functions in a manner similar to that in which a court acts in respect of an inquiry. Rainier's Dairies v. Raritan Valley Farms, Inc., supra; Gatley, Libel & Slander (4 ed. 1953), at 181.
However, the privilege does have its limits. As stated in Fenning, supra:
* * * The absolute privilege extends no further in this area, and defamatory statements, though relevant, made to other officers or bodies acting, though officially, other than in a quasi-judicial proceeding, for instance, revert to a status of qualified privilege, a much lesser form of immunity, usually inducing a jury issue as to elements of malice, reasonable cause, good faith and the like. [citing cases; 47 N.J. Super. at 117-118]
In analyzing the respective causes of action alleged by plaintiffs this court has the initial responsibility of determining whether the occasion upon which defendant published the report was absolutely privileged. Accordingly, three questions suggest themselves:
I. Given the facts of this case, is the policy behind the privilege furthered by its application in the instant matter?
II. If such privilege exists, what causes of action are affected thereby?
III. Are there alternative remedies available to plaintiffs if they are barred by a successful assertion of the privilege?

I
Early in the development of the law of defamation, privileged defamatory matter was divided into two general categories: (1) absolutely privileged and (2) qualifiedly privileged. The difference between the two is that a finding of malice destroys the latter, but the former remains absolute, even in the face of intentional falsehood. Rogers v. Thompson, *455 supra, 89 N.J.L. at 640; Rainier's Dairies v. Raritan Valley Farms, Inc., supra, 19 N.J. at 558; Prosser, Law of Torts (4th ed. 1971), § 114-115, at 776-796.
Although framed in terms of defamation, the privilege has also been recognized by the courts of this State to bar other causes of action that arise from conduct of parties and/or witnesses in connection with a judicial proceeding. In Rainier, supra, the privilege was held to bar an action for tortious interference with business relations, the court stating:
If the policy, which in defamation actions affords an absolute privilege or immunity to statements made in judicial and quasi-judicial proceedings is really to mean anything then we must not permit its circumvention by affording an almost equally unrestricted action under a different label. [19 N.J. at 564]
Similar reasoning was held to bar such a claim in Middlesex Concrete, etc. v. Carteret Industrial Ass'n, supra, 68 N.J. Super. at 91.
There is a strong public policy favoring free expression in the judicial system, justifying the application of an absolute privilege in favor of those who involve themselves in judicial or quasi-judicial proceedings. Underlying the privilege's creation as an exception to the general rules of liability is the "supervening public policy that persons in such circumstances be permitted to speak and write freely without restraint or fear of an ensuing defamation action, this sense of freedom being indispensable to the due administration of justice." Fenning, supra, 47 N.J. Super. at 117. Once the privilege has attached, even a showing of actual malice will not destroy it. Rainier's Dairies, supra, 19 N.J. at 558; Rogers v. Thompson, supra, 89 N.J.L. at 640.
Nevertheless, this court remains mindful of the need to balance the competing interests involved here. As stated by Justice Van Vechten Veeder in his article, "Absolute Immunity in Defamation," 9 Col. L. Rev. 463, (1909), quoted by the court in Laun v. Union Electric Co. of Mo., 350 Mo. 572, 166 S.W.2d 1065, 1071 (Sup. Ct. 1943):
*456 The absolute immunity in defamation accorded on certain occasions * * * presents a conflict or antinomy between two principles equally regarded by the law  the right of the individual on one hand, to enjoy his reputation, unimpaired by defamatory attacks, and, on the other hand, the necessity, in the public interest, of a free and full disclosure of facts in the conduct of the legislative, executive and judicial departments of government.
In carrying out its responsibilities this court will not lightly extend the grant of absolute privilege to new situations unless the policy upon which the privilege is based is found to exist. Coleman v. Newark Morning Ledger Co., 29 N.J. 357 (1959), (dissenting opinion of Justice Weintraub at 386); Laun, supra at 1070.
The facts of this case present a situation that is one of first impression in this State  the extension of the privilege to situations where the actions taken precede any legal proceedings, here by a period of approximately two months.
The appellate authority in New Jersey has treated only situations where statements were made during judicial or quasi-judicial proceedings. Thus in Middlesex the report was commissioned some nine months after suit had been commenced. 68 N.J. Super. at 88-89. Similarly, the acts complained of in Rainier's Dairies occurred subsequent to the triggering of the administrative process. 19 N.J. at 552. See also, Fenning v. S.G. Holding Corp., supra (letter written during rent increase application); Thourot v. Hartnett, 56 N.J. Super. 306 (App. Div. 1959) (defamatory matter contained in the complaint); Rogers v. Thompson, supra (during creditors' meeting in bankruptcy proceedings); and cf. Spoehr v. Mittelstadt, 34 Wis.2d 653, 150 N.W.2d 502 (Sup. Ct. 1967) (pretrial conference); Stewart v. Hull, 83 Ky. 375 (Ct. App. 1885) (pre-trial discovery); Thornton v. Rhoden, 245 Cal. App.2d 80, 53 Cal. Rptr. 706 (D. Ct. App. 1966) (pretrial discovery).[2]
*457 Defendant cites Restatements, Torts, § 588, which provides as follows:
A witness is absolutely privileged to publish false and defamatory matter of another in communications preliminary to a proposed judicial proceeding and as part of a judicial proceeding in which he is testifying if it has some relation thereto. [Emphasis supplied]
In support of his position defendant argues that the emphasized portion of this Restatement section is embodied in the decisional law of New Jersey. Specifically, defendant relies on dictum found in Middlesex Concrete, supra:
The privilege or immunity is not limited to what a person may say under oath while on the witness stand. It extends to statements or communications in connection with a judicial proceeding. It protects a person while engaged in private conferences with an attorney with reference to litigation. [citations omitted].

* * * * * * * *
If this were not so, every expert who acts as a consultant for a client with reference to proposed or actual litigation, and thereafter appears as an expert witness, would be liable to suit at the hands of his client's adversary on the theory that while the expert's testimony was privileged, his preliminary conferences with and reports to his client were not, and could form the basis of a suit for tortious interference. [68 N.J. Super. at 92]
Notwithstanding these statements, the facts of this case do not mandate so simple a resolution of the question. Although the affidavit of defendant was offered by the husband during the pendency of the divorce action and thus was absolutely privileged, much more difficult questions arise as to the report which preceded the affidavit at a time when litigation had not been instituted, and may not even have been contemplated.
*458 It is by no means clear that the report in question (when it was originally rendered) was made in connection with proposed litigation. Rather, all that is indicated is that the report was given to Hogan and his attorney, and suit was later instituted. It will be a matter of proof as to whether the attorney was consulted for the purpose of filing for divorce or merely for general matrimonial advice, and whether the report was merely investigative for the husband's information concerning his wife, or to gather proof for a then contemplated divorce action. In other words, all the court has before it is a privilege asserted to be retroactively conferred by the later filing of the divorce action.
None of the safeguards that tend to mitigate the harshness of absolute privilege was present in this situation. The court in Rainier's Dairies, when it discussed the extension of the doctrine to quasi-judicial proceedings, noted:
* * * the potential harm which may result from the absolute privilege is somewhat mitigated by the formal requirements such as notice and hearing, the comprehensive control exercised by the trial judge whose action is reviewable on appeal, and the availability of retarding influences such as false swearing and perjury prosecutions; and the view has been expressed that it is only the potential harm as thus mitigated which may properly be considered outweighed by the public interest in favor of broad access by suitors to the courts. [citations omitted; 19 N.J. at 562]
In the instant case, the damage was done before any of the safeguards guaranteed by the system could come into existence.
Neither the court nor counsel have been able to locate other cases which deal directly with the problems posed. However, the Missouri case of Laun v Union Electric Co. of Mo., supra (166 S.W.2d 1065) provides some guidelines. There the absolute immunity of a litigant in a proceeding was not extended to one who caused or procured the privileged party to publish the defamatory matter in its complaint. Plaintiff Laun was an employee of the Union Electric Co. of Missouri as well as the Mississippi Power Co. The latter company *459 held all of the stock of both the Union Electric Co. of Illinois and the Mississippi River Power Co. As described by plaintiff, his duties were as a "lobbyist and legislative agent" for defendants. He alleged that in the course of his duties he engaged in certain activities which, if became known to the Securities and Exchange Commission, would result in great difficulty to defendants. Subsequent to the disclosure of plaintiff's dealing to S.E.C. authorities, Mississippi River Power Co. and Union Electric Co. of Illinois filed suit in Federal District Court against plaintiff and others, charging them with misappropriation of funds. The substance of plaintiff's allegation was that after the facts were finally disclosed to the S.E.C., defendants, though not parties to the action, authored and maliciously caused certain defamatory matter to be placed in the pleadings.
In holding that plaintiff's cause of action was not barred by the assertion of absolute privilege, the court examined the question of whether the policy behind the privilege would be furthered by allowing its application, and concluded that it would not:
Liability [for defamation] attaches to one who requests, aids or procures another to publish the defamatory matter, "the procurer is guilty of a publication whenever it takes place." Folkard's Starkie On Slander & Libel, § 539, p. 574, Odgers, Libel & Slander, p. 168 * * *.

* * * * * * * *
We find no reason or principle of public policy demanding the extension of the doctrine to those who are alleged to have procured the publication of the libelous matter by others who were privileged to do so because they were parties to litigation * * * [166 S.W.2d 1070-1071]
This court is troubled by the potential for abuse in the area of prelitigation communications. At the same time it is not oblivious to the problems which may arise in the case where an expert is legitimately commissioned or other witnesses obtained by a prospective litigant. Nothing said here is intended to undermine the privilege currently enjoyed by *460 those parties. Where, however, a factual report is issued some two months before litigation, and is alleged to be almost totally false, this court cannot in good conscience pronounce that as a matter of law it is entitled to the benefit of a retroactive privilege.
Because of the difficulties which inhere in an automatic application of the privilege under these circumstances, the determination of whether the privilege attaches should be made on a case-by-case basis, following a preliminary hearing by the court similar to that prescribed by Evid. R. 8(1). Cf. Lopez v. Swyer, 62 N.J. 267, 275-276 (1973). The existence of the privilege is a question of law traditionally within the province of the court. Under a procedure comparable to the Lopez v. Swyer hearing, the court would be enabled to resolve the important factual questions raised by the application of privilege to pretrial communications. Such an approach, not overly cautious, better serves the policy behind the privilege, and hence the interests of justice. The party asserting the privilege will have the burden of showing the connection between the defamatory matter uttered and the subsequent litigation. If it is found that the report was solely for investigatory purposes and that defendant had no direct connection with the ensuing litigation, the privilege claimed by defendant in the instant case should rise no higher than a qualified one. Fenning v. S.G. Holding Corp., supra, 47 N.J. Super. at 117.
Defendant urges as an alternative ground for an absolute privilege that he is a private detective, and is thus protected from any claim based upon the falsity of his reports. No authority is cited for this proposition. It is inconceivable that in circumstances such as are present in this case the court would find itself precluded from examining the good faith of defendant in submitting the report to plaintiff Hogan's husband. The fact that defendant, as a private detective, is empowered under N.J.S.A. 45: 19-9(a)(9) "to secure evidence to be used in the trial of any civil or criminal cause" cannot be read to exempt him *461 from liability. Nor is there any suggestion that the Legislature ever intended such a result.
One final note should be made with regard to denial of summary judgment on this point. Although not argued at length before the court, plaintiff Devlin alleges that the contents of the report were somehow made known by defendant to parties unconnected with the divorce litigation. While this is contrary to the affidavit submitted by defendant on this motion, plaintiffs have not yet had the benefit of full discovery. Initial interrogatories to defendant have not yet been answered. All parties concede that the publication of the contents of the report to strangers would not only destroy any claim of absolute privilege through a negation of the relevancy requirement, but also would tend to negate even a qualified privilege. Prosser, op. cit., § 115 at 786-787.

II
If this court finds the basis of an absolute privilege, such a finding will bar most of the causes of action now pleaded by plaintiffs. However, if the absolute privilege is not found to exist, certain clarifications are in order.
As noted above, both plaintiffs have asserted causes of action in privacy. Because of the novel nature of the particular form of the tort applicable to this case, a brief discussion is warranted.
The cause of action for invasion of privacy is generally recognized in this jurisdiction. McGovern v. Van Riper, 137 N.J. Eq. 24 (Ch. 1945), aff'd 137 N.J. Eq. 548 (E. & A. 1946); Palmer v. Schonhorn Enterprises, Inc., 96 N.J. Super. 72 (Ch. Div. 1967); Weller v. Home News Publishing Co., 112 N.J. Super. 502 (Law Div. 1970). For a concise history of the development of the law in this State see Canessa v. Kislak, Inc., 97 N.J. Super. 327 (Law Div. 1967); and see, Annotation, "Right of Privacy," 14 A.L.R.2d 750 (1950).
*462 The development of the tort, as well as its relation to more traditional causes of action, is a continuing evolution. As noted in Prosser, op. cit. § 117 at 804: "Today, with something over 400 cases in the books, some rather definite conclusions are possible. What has emerged is no simple matter".
The cause of action for privacy recognizes four distinct types of invasion. They are commonly designated as (1) appropriation (consisting of appropriation, for one's benefit of another's name or likeness); (2) intrusion or "true privacy" (intrusion upon the physical solitude of another, eavesdropping, etc.); (3) public disclosure of private facts (publication of private facts about the plaintiff, even if true), and (4) false light privacy (placing plaintiff in a false light in the public eye). Prosser, op. cit. at 804-814. As noted in Prosser, the above classifications reach "four different interests of the plaintiff, which are tied together by a common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff `to be let alone.'" Id. at 804. Plaintiffs claim only a "false light privacy" invasion, and thus assert a category of the tort acknowledged, but not yet explored, in this jurisdiction.[3] A delineation of this type of invasion is set forth in Restatement, Torts 2d, § 652E (Tent. Draft No. 27, April 1976):

PUBLICITY PLACING PERSON IN FALSE LIGHT
One who gives publicity to a matter concerning another which places the other before the public in a false light is subject to liability to the other for invasion of privacy if
(a) The false light in which the other was placed would be highly offensive to a reasonable person, and
(b) The actor had knowledge of or acted in reckless disregard as *463 to the falsity of the publicized matter and the false light in which the other would be placed.[4]
A review of the case law in this jurisdiction reveals authority which lends historical support to the proposition of one's entitlement to be free of false imputations. In Vanderbilt v. Mitchell, 72 N.J. Eq. 910 (E. & A. 1907), plaintiff sought relief against his estranged wife and a custodian of public records cancelling a birth certificate falsely naming him as the father of an infant born to his estranged wife. Although it ultimately rested its holding upon a violation of plaintiff's property rights, the court made the following remarks:
If it appeared in this case that only the complainant's status and personal rights were thus threatened or thus invaded by the action of the defendants and by the filing of the false certificate, we should hold, and without hesitation, that an individual has rights, other than property rights, which he can enforce in a court of equity and which a court of equity will enforce against invasion, and we should declare that the complainant was entitled to relief, and to a decree * * * relieving the complainant of the intolerable burden prima facie put upon him by the false record and preventing the wife from perpetrating a fraud upon the husband. [citations omitted; at 919]
Defendant's report in the present case, imputing to plaintiffs an adulterous relationship, constitutes libel as a matter of law. However, the action in false light privacy should not be confused with defamation, as stated in Prosser, op. cit. at 813:
*464 The false light need not necessarily be a defamatory one, although it very often is, so that a defamation action will also lie. It seems clear however, that it must be something that would be objectionable to the ordinary man under the circumstances and that * * * the hypersensitive individual will not be protected.
This principle was demonstrated in Leverton v. Curtis Publishing Co., 192 F.2d 974 (3 Cir.1957). There a picture of plaintiff lying in the street following a car accident was used by defendant in an article on pedestrian traffic accidents. Plaintiff had indeed been involved in a car accident, but that had occurred prior to the article being written. The article was entitled "They Ask To Be Killed," and beside the title there appeared the question; "Do you invite massacre by your own carelessness?" In finding liability the court noted:
Yet the facts, so far as we know them in this case, show that the little girl, herself, was at the time of her accident not careless and the motorist was. The picture is used in connection with several headings tending to say that this plaintiff narrowly escaped death because she was careless of her own safety. That is not libelous; a count for defamation was dropped out in the course of the trial. But we are not talking now about liability for defamation. We are talking about the privilege to invade her interest in being left alone. [at 978]
See also, Cantrell v. Forest City Publishing Co., 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974) (article in newspaper describing plaintiff's poverty and dilapidated living conditions following death of father); Metzger v. Dell Publishing Co., 207 Misc. 182, 136 N.Y.S.2d 888 (Sup. Ct. 1955) (publication of photograph depicting plaintiff as a member of a gang of juvenile delinquents); Martin v. Johnson Publishing Co., 157 N.Y.S.2d 409 (Sup. Ct. 1956) (publication of plaintiff's photo in a magazine story entitled "Man-Hungry").
Despite the fact that the right to privacy exists as an independent cause of action, and not "merely an incident to some other long recognized rights" (McGovern v. Van Riper, 137 N.J. Eq. 24, 32 (Ch. 1945), aff'd 137 *465 N.J. Eq. 548 (E. & A. 1946)), a finding of absolute privilege to publish by defendant will bar the cause of action. This conclusion follows logically from the fact that an essential element of false light privacy is an unprivileged publication. As noted in § 625F of Restatement, Torts 2d (Tent. Draft No. 27, April 1976):
The rules as to absolute privilege to publish defamatory matter stated in sections 583 to 592A apply to publication of any matter which is an invasion of privacy.[5]
Similarly, the analogy to defamation compels the conclusion that the claim will necessarily be subject to the existence of a qualified privilege founded in the relationship of defendant to Thomas Hogan. Coleman v. Newark Morning Ledger Co., supra, 29 N.J. at 375-376; Sokolay v. Edlin, supra, 65 N.J. Super. at 123.
As to the other causes of action pleaded, only that sounding in negligence is seriously disputed by defendant. He urges that an absence of a duty owing by him to the plaintiffs precludes such an action.
The concept of duty is explained in Wytupeck v. Camden, 25 N.J. 450 (1957), as follows:
"Duty" is not an abstract conception; and the standard of conduct is not an absolute. Duty arises out of a relation between the particular parties that in right reason and essential justice enjoins the protection of the one by the other against what the law by common consent deems an unreasonable risk of harm, such as is reasonably foreseeable. * * * In the field of negligence, duty signifies conformance "to the legal standard of reasonable conduct in the light of the apparent risk"; the essential question is whether "the plaintiff's interests are entitled to legal protection against the defendant's conduct."
*466 * * * Duty is largely grounded in the natural responsibilities of social living and human relations, such as have the recognition of reasonable men; and fulfillment is had by a correlative standard of conduct. [at 461]
While the research of counsel and the court reveals no case on all fours with the instant matter, the court can apply the above quoted standard from Wytupeck to this case. Defendant clearly had a duty to those he observed to report accurately on their activities. He is a private detective, licensed under N.J.S.A. 45:19-12. It is his business, among other things, to supply his clients with information or factual data concerning the activities of others. Where the information gathered by him is of a delicate or sensitive nature, his duty to report that information accurately should extend not only to the person who hired him, but also to the subjects of his surveillance  people whose lives may be materially affected by the accuracy of his reports. As stated in Kahalili v. Rosecliff Realty, Inc., 26 N.J. 595 (1958):
In a word, the standard of conduct laid down by the law is care commensurate with the reasonably foreseeable risk of harm, such as would be reasonable in light of the apparent risk; for negligence is essentially a matter of risk, that is to say, of recognizable danger of injury. And there are compelling considerations of social, moral and ethical principle and policy for according protection to others * * *. [at 603]
There is no reason, in law or public policy, why defendant should be exempted from this traditional societal standard, although the question of whether he should have foreseen the consequences of his failure to issue an accurate report is, of course, one for the jury. Accordingly, barring the validity of the absolute privilege asserted by defendant, he may be found liable to plaintiffs on a negligence theory.
This duty to report information accurately springs from a second source, in addition to the traditional principles of negligence. In procuring a license to be a private detective, defendant holds himself out to be a person of good *467 character, competency and integrity. N.J.S.A. 45:19-12; Schulman v. Kelly, 54 N.J. 364 (1969). The requirements of the statute evince a legislative recognition of the potential for abuse inherent in defendant's business. The Legislature thus exercised control, in the societal interest, over the people upon whom it conferred the powers enumerated in N.J.S.A. 45:19-9. The entire tenor of licensing statute indicates that its aim is to impose a standard of competent professionalism upon licensed private detectives.
The case of Davi v. Cabana Pools, Inc., 135 N.J. Super. 372 (App. Div. 1975), is apposite. Plaintiffs there entered into a contract with Cabana Pools, Inc., for the installation of a swimming pool on their property. Defendant Stearns, president of his own pool company, was employed part-time by Cabana and other companies to obtain the necessary building and zoning permits. The applications filed by defendant Stearns were replete with misstatements. As a result, plaintiffs were ultimately compelled to remove the pool at their own expense, since its existence on their property eventuated a violation of the zoning ordinance. At trial the judge granted defendant Stearns' motion for judgment, holding that he did not owe any duty to plaintiffs and that the representations made by him in applications for the building and zoning permits were not relied upon by plaintiffs. 135 N.J. Super. at 376.
The Appellate Division, citing Wytupeck v. Camden, supra, reversed the judgment of the trial court, stating:
Stearns was paid at the rate of $20. an application and had processed approximately 60 to 70 such applications for Cabana alone. He also handled similar applications for other companies, as well as his own pool company. He knew, or at the very least should have known, that the issuance of the necessary building and zoning permits was dependent upon the truth and accuracy of the facts stated in the applications * * * In spite of this Stearns did nothing to verify the truth or accuracy of the facts he certified in the applications and admittedly never gave any consideration to the consequences of his conduct. [135 N.J. Super. at 376-377]
*468 See also, Eschle v. Eastern Freight Ways, 128 N.J. Super. 299 (Law Div. 1974) (holding a negligent insurance agent liable to a party injured by defendant's uninsured client); Tarasoff v. Regents of University of California, 13 Cal.3d 177, 118 Cal. Rptr. 129, 529 P.2d 553 (Sup. Ct. 1974); 17 Cal.3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (Sup. Ct. 1976) (holding psychotherapist liable for negligent failure to warn potential victim or her parents that the violence-prone patient undergoing psychiatric treatment by defendant had made threats against the victim whom he subsequently murdered).
In support of his position, defendant cites the case of J.H. Becker, Inc. v. Marlboro Tp., 82 N.J. Super. 519 (App. Div. 1964). There plaintiff taxpayer sought, among other things, damages from defendant appraisal company hired by the township, on the theory that it was injured by defendant's negligent revaluation of township realty. The holding of the court regarding the negligence count is distinguishable from the instant facts. The evaluations given by the appraisal company were, by definition, opinions; the defendant's report in the instant case contained a chronology of objective factual observations. In addition, this court has found no instance of the Becker case being subsequently cited for the proposition that an individual hired by a stranger to the litigation cannot be held to a duty owing to one other than his employer. The contrary is true. 3 Am. Jur. 2nd, Agency § 300 at 660-661.
In sustaining this negligence count one additional cautionary note is necessary. The pleadings and briefs filed by plaintiffs suggest that among the injuries they suffered is the bringing of the divorce action by plaintiff Hogan's husband. An action brought for the wrongful institution of judicial proceedings is recognized in this State as malicious prosecution, discussed infra. The name of the action bespeaks its elements, to wit, that plaintiff has the responsibility of proving not only lack of probable cause but also malice and special injury. Toft v. Ketchum, 18 N.J. 280, 287, opinion *469 adhered to 18 N.J. 611 (1955), cert. den. 350 U.S. 887, 76 S.Ct. 141, 100 L.Ed. 782 (1955). Malicious prosecution remains the sole theory of redress for one who has been injured by the wrongful institution of suit. Cf. Genito v. Rabinowitz, 93 N.J. Super. 225 (App. Div. 1966). And, as long as the case law of this jurisdiction requires a showing of malice as a prerequisite to liability, plaintiffs cannot recover damages for the wrongful institution of suit on an allegation of simple negligence.

III
Plaintiffs have also alleged that defendant's report was intentionally false, and thus a cause of action for malicious prosecution may lie against defendant. Such an action may be maintained even if the court determines that defendant is entitled to an absolute immunity with respect to the other causes of action alleged. Rainier's Dairies, supra, 19 N.J. at 554-556.
The tort of malicious prosecution is one traditionally disfavored in the law. Toft v. Ketchum, supra (concurring opinion of Justice Jacobs at 287). As stated in Rainier's Dairies, this tort, not unlike the doctrine of absolute privilege, developed out of the philosophical tug of war between two competing interests: "the freedom of action that every man should have in bringing violators to justice and the necessity for checking `lying accusations of innocent people.'" 19 N.J. at 565. The justification for allowing the action lies in the statement of Dean Prosser:
* * * But surely there is no policy in favor of vexatious suits known to be groundless, which are a real and often a serious injury; and the heavy burden of proof upon the plaintiff to establish both lack of probable cause and an improper purpose, should afford sufficient protection to a bona fide litigant and adequate safeguard against a series of actions. [Prosser op. cit., § 120 at 851]
Put another way by the court in Mayflower Industries v. Thor Corp., 15 N.J. Super. 139, 154 (Ch. Div. 1951), aff'd 9 N.J. *470 605 (1953), "The right to litigate is not the right to become a nuisance" (quoting from Melvin v. Pence, 76 U.S. App. D.C. 154, 130 F.2d 423-424 (D. Cir.1942)).
Because of the strong public policy in favor of free access to the courts, the action for malicious prosecution has been markedly restricted.
It is well settled that the fundamental grounds upon which an action for malicious prosecution rests are that it [the prior action] was instituted against plaintiff without reasonable or probable cause, that the defendant was actuated by a malicious motive in making the charge, and that it has ended in plaintiff's favor. The proofs must sustain all of those grounds or plaintiff's suit must fail. [Evans v. Jersey Central Power & Light Co., 119 N.J.L. 88, 91 (E. & A. 1937)]
See also, Kearney v. Mallon Suburban Motors, 135 N.J.L. 457 (E. & A. 1947); Shoemaker v. Shoemaker, 11 N.J. Super. 471 (App. Div. 1951); Heyman v. Stein, 96 N.J. Super. 586 (App. Div. 1967).
There is an additional element, announced by the court in Potts v. Imlay, 4 N.J.L. 377, 382 (Sup. Ct. 1816), and reiterated by the court in Rainier's Dairies, namely, that of a "special grievance." In Potts the court dismissed an action based on a prior civil proceeding, holding that an action for malicious prosecution could not be founded upon a civil proceeding "unless the defendant in that suit was arrested without cause and deprived of his liberty or made to suffer other special grievance different from and superadded to the ordinary expense of a defense." [Emphasis supplied.]
The Potts case, while adding the element of a "special grievance" to the cause of action, nevertheless furnished a precedent for extending malicious prosecution from its historical function as redress for wrongful institution of criminal proceedings to civil proceedings. See also, Rainier's Dairies, supra, 19 N.J. at 564, and Mayflower Industries v. Thor Corp., supra.
We turn now to the obvious fact that it was not defendant Greiner who initiated the divorce proceeding, but *471 rather his principal, Thomas Hogan. Although an action against defendant in this factual context does not fall within the conventional circumstances giving rise to the action, such novelty should not necessarily bar the cause. One who, without probable cause, advises or assists another person to begin a proceeding, should not be exempted from liability simply because his name does not appear on the complaint. This is particularly so where it is alleged that the intentional rendering of false information actually induced the lawsuit. As stated by Prosser, op. cit., § 119, at 836-837:
The defendant may be liable either for initiating or for continuing a criminal prosecution without probable cause. But he cannot be held responsible unless he takes some active part in instigating or encouraging the prosecution. * * * if he advises or assists another person to begin the proceeding, ratifies it when it is begun in his behalf, or takes any active part in directing or aiding the conduct of the case, he will be responsible.
In ascertaining the degree of involvement by defendant necessary to sustain an action against him, this court is guided by Seidel v. Greenberg, 108 N.J. Super. 248 (Law Div. 1969). Seidel presented a unique set of facts. Plaintiff, an innocent party, was subjected to criminal prosecution for a lumber yard fire. His employers, principal stockholders of the business, were later found guilty of deliberately causing the building to burn down for the purpose of defrauding their insurance companies, and related criminal charges. Plaintiff was implicated because of his close contact with defendants. The court made the following findings of fact:
They [defendants] did not specifically intend that plaintiff, or any one else, be accused of criminal acts or subjected to any prosecution. They did not themselves make any accusations against him which set the proceedings in motion against him or caused their continuance. It is also clear that at no time did the Greenbergs, who knew of their own complicity and that plaintiff was in no way involved, come forward to establish plaintiff's innocence or to endeavor to stop the proceedings against him on the ground that he was innocent. At no *472 time, even after their convictions, have they come forward to clear his name. Finally, it is clear that if defendant had not performed their criminal acts and caused the fire to be set, plaintiff would not have suffered the injuries and damages for which relief is sought. [at 255]
Noting that the circumstances presented by the case were unique, the court determined that relief should not be denied because of the unconventional nature of the action.
It is axiomatic that the simple fact that his action does not fit into a nicely defined or established `cubby-hole' of the law does not in itself warrant the denial of relief to him. [citations omitted; at 256]
The determination of defendant's culpability in bringing about the wrongful proceeding was framed in terms of proximate causation. As noted by the court:
The fundamental and underlying basis for liability for malicious prosecution is stated in many cases and in secondary authorities in the language of proximate causation. Typical is the rule laid down in 54 C.J.S. Malicious Prosecution § 14 at 966, as follows:
"The test of liability in an action for malicious prosecution is: Was defendant actively instrumental in putting the law in force? In order to sustain the action, it must affirmatively appear as a part of the case of the party demanding damages that the party sought to be charged was the proximate and efficient cause of maliciously putting the law in motion, and, if such fact appears, defendant is liable, although he did not actually make or sign the affidavit on which the warrant was issued, or although he was not the prosecutor of record." [at 258; emphasis added]
While the issue of proximate cause carries further problems such as "foreseeability," "duty" and "intervening cause" [see Seidel, supra at 259], the court need not explore those issues at this time. They are better left for factual resolution at trial. Suffice it to say that no facts have been adduced on this motion which would incline the court to rule that, as a matter of law, the false report issued by defendant was not a substantial factor in bringing about the subsequent divorce action grounded in adultery.
*473 Although the facts stated in plaintiffs' complaints raise the issue of malicious prosecution, all of the essential elements of the cause of action have not been pleaded. As noted at oral argument, this additional claim should and will be asserted by way of amended complaints. Notwithstanding the liberalization of our rules of pleading, "even the new rules have not dispensed with the need for alleging the conditions precedent to the existence of a particular cause of action." Mayflower Industries v. Thor Corp., supra, 15 N.J. Super. at 150. Leave is therefore granted for plaintiffs to amend their complaints to assert this additional cause of action.
Affording plaintiffs the benefit of all favorable inferences for purposes of this motion, this court finds that defendant's conduct is actionable. Accordingly, except as limited herein, the motion for summary judgment based on absolute privilege is denied without prejudice. Following the completion of discovery either party may apply to the court for the purpose of setting a date for hearing under Evid. R. 8(1) on the issue of absolute privilege.
NOTES
[1] The existence of a qualified privilege, based upon the principal-agent relationship between defendant and Thomas Hogan has not been briefed or argued by the parties. Such a privilege is founded upon the corresponding interests of defendant and his employer.

A communication "made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contains criminatory matter which, without this privilege, would be slanderous and actionable"; the "fundamental test is the bona fides of the communication," and it is not privileged when the person making it has "full knowledge of its untruthfulness." [Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 375-376 (1959); quoting from Lawless v. Muller, 99 N.J.L. 9, 12 (Sup. Ct. 1923)]
See also, Sokolay v. Edlin, 65 N.J. Super. 112 (App. Div. 1961). In view of what has been alleged, the issue need not be discussed at this time.
[2] Cf. Cashen v. Spann, 66 N.J. 541 (1975) where, in a civil action for damages, the court affirmed a reversal of a summary judgment granted to police officers who allegedly took part in the preparation of a false affidavit in procuring a search warrant, and held the informer privilege unavailable to prevent disclosure of the identity of the person who supplied the false information. In this investigatory stage of that criminal proceeding, there was no assertion that an absolute privilege attached.
[3] Cf. Canessa v. Kislak, Inc., 97 N.J. Super. 327 (Law Div. 1967); Palmer v. Schonhorn Enterprises, Inc., 96 N.J. Super. 72 (Ch. Div. 1967).
[4] Because the action involved here was not a matter within the realm of public interest, not published by the news media, and only private parties involved, as opposed to public figures, part (b) of the Restatement definition may not necessarily obtain in the context of the instant case.

Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed. 2d 456 (1967); Cf. Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); Gertz v. Robert Welch Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1975). This question thus need not be explored at this time.
[5] But cf. Froelich v. Adair, 213 Kan. 357, 516 P.2d 993 (Sup. Ct. 1973), wherein the privilege was held not to apply to "physical intrusion" privacy based upon a distinction between a privilege to publish and the privilege to interfere with the solicitude of one's person.